UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN AUSTIN WHITE,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>　　　　Defendant. | Case No.: 1:15-cv-01367 - JLT<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT CAROLYN COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF ALAN AUSTIN WHITE |

　　　　Alan Austin White asserts he is entitled to a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the credibility of his subjective complaints. Because the ALJ carried the duty to identify clear and convincing reasons for rejecting Plaintiff's credibility, the ALJ's decision is **AFFIRMED**.

## PROCEDURAL HISTORY

　　　　Plaintiff filed his applications for benefits in May 2012, alleging disability beginning September 25, 2006. (Doc. 9-3 at 12; *see also* Doc. 9-6 at 2, 6) The Social Security Administration denied Plaintiff's applications at the initial level on August 16, 2012, and upon reconsideration on January 22, 2013. (*See* Doc. 9-3 at 12) After requesting a hearing, Plaintiff testified before an ALJ on January 31, 2014. (Doc. 9-3 at 25) The ALJ determined Plaintiff was not disabled and issued an order denying benefits on February 4, 2014. (*Id.* at 12-20) Plaintiff's request for review by the Appeals

Council was denied on July 16, 2015. (*Id.* at 2) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

The Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.   Relevant Medical Evidence**

In September 2006, Plaintiff suffered an electrocution injury when "he had his hands in a sink of water [and] the garbage disposal shorted out." (Doc. 9-8 at 7) Plaintiff reported that "he was thrown backward" against a wall, but did not suffer a loss of consciousness. (*Id.* at 7, 11) Plaintiff complained he had "constant numbness in his upper extremities from his should down to his fingertips" following the injury. (*Id.* at 7)

In February 2007, Plaintiff complained that he had "numbness/tingling" in his hands. (Doc. 9-8 at 22) Treatment notes from CSP Corcoran indicate Plaintiff's EMG and neurological studies were negative. (*Id.*) However, an MRI showed "nerve impingement and C4-C5-C6 herniated disk." (*Id.*) Plaintiff reported his pain had increased, but was "better [with] Neurontin." (*Id.*)

In March 2007, Plaintiff continued to report an increase in pain. (Doc. 9-8 at 21) He described his low back pain as "severe," and said he "can't even bend at all." (*Id.* at 20) He reported that his back hurt more if he sat for too long and his legs would "fall asleep" if he stood "very long." (*Id.* at 21) Dr. Roozrokh, a physician at CSP Corcoran, observed that Plaintiff limped when walking. (*Id.* at 20) Upon examination, Dr. Roozrokh determined that Plaintiff had a "very limited" range of motion in his back and a positive straight leg test. (*Id.*) Dr. Roozrokh increased Plaintiff's prescription of Neurontin to the "max dose," increased the prescription for Norco, and indicated Plaintiff need a back brace. (*Id.*)

In June 2007, a physician at CSP Corcoran suggested a referral for a neurosurgery evaluation, noting Plaintiff continued to complain of "neck pain, lower back pain, [and] bilateral anterior thigh

numbness." (Doc. 9-8 at 14)  However, Plaintiff "refused [the] referral," stating he "wanted to wait until parole." (*Id.*)

Treatment notes from September 2007 indicate that Plaintiff was "agile" and walked with a "stable gait." (Doc. 9-8 at 16)  Plaintiff had a negative straight leg raise test. (*Id.*)  Plaintiff received a prescription for Tylenol to begin when his Norco stopped on September 19.

In December 2007, Dr. Roozrokh observed that Plaintiff could "not hold heavy objects in his hands at all." (Doc. 9-8 at 12)  Dr. Roozrokh requested Plaintiff receive MRIs on his cervical and lumbar spines. (*Id.* at 11-12)  In addition, Plaintiff received a referral for a neurological examination. (*Id.* at 7, 10)

On January 7, 2007, Dr. Rolando Young noted that Plaintiff complained of numbness in his arms, as well as "pain in the middle of his back and numbness of the right thigh." (*Id.* at 7)  Upon examination, Dr. Young determined that Plaintiff's right and left median and ulnar "sensory distal latencies [were] normal." (*Id.* at 8)  In addition, Plaintiff's "motor distal latencies [were] normal." (*Id.*)  Dr. Young found "no electrical findings for either carpal tunnel syndrome or ulnar neuropathy," and the needle EMG examination of both extremities was "normal." (*Id.* at 8-9)  Dr. Young concluded the nerve conduction results were "normal" in "both upper extremities." (*Id.* at 9)

Plaintiff had an MRI of his cervical spine on January 24, 2007. (Doc. 9-8 at 6)  Dr. Mario Deguchi determined Plaintiff suffered from degenerative disc disease and hypolordois. (*Id.*)  Dr. Deguchi also found "posterior disc protrusion[s] measuring approximately 3mm" at both the C4/C5 and C5/C6 levels. (*Id.*) Dr. Deguchi opined there were "possible impingement[s]" of the C5 and C6 nerve roots. (*Id.*)

In March 2007, Plaintiff had an MRI of his lumbosacral spine. (Doc. 9-8 at 5)  Dr. Deguchi found "[c]ongenital narrowing of [the] L5/S1 intervertebral disc" and a "posterior disc bulge without impingement of lumbar nerve roots" at the L5/L5 level. (*Id.*)

Throughout the course of his incarceration, Plaintiff received "no treatment other than medication." (Doc. 9-8 at 32)  Although released in December 2009, Plaintiff violated parole and was re-incarcerated. (*Id.*)  During that time, Plaintiff "did light duty [work]." (*Id.*)  In June 2010, he was "paroled with medications including morphine and Neurontin." (*Id.*)  However, he was arrested again

the next month and served 18 months at High Desert State Prison, where he "was assigned only light duties." (*Id.*) After his release, Plaintiff sought to begin treatment for the injury he sustained, beginning treatment with Dr. Marshall Lewis in 2012. (*Id.*)

Plaintiff sought treatment from Dr. Lewis for his "chest, arms, wrists, hands, fingers and legs." (Doc. 9-8 at 101) Plaintiff reported he had "shoulder pain and numbness running down [his] [left] arm." (*Id.*) In addition, Plaintiff said he had "difficulties with standing, pushing and pulling, [and] lifting and carrying greater than ten pounds because it increase[d] his pain." (*Id.* at 88-89) Dr. Lewis observed that Plaintiff had a "somewhat limited range of motion" in his shoulder, explaining that Plaintiff could adduct and abduct the shoulder, "but when … internally and externally rotating to get to the bathing beauty pose, he [was] unable to do so." (*Id.* at 94) Dr. Lewis found also that Plaintiff's hand grip was weaker on the left side, because his grip was "about 90 on the left via the dynamometer," compared to 120 on the right. (*Id.*) Dr. Lewis diagnosed Plaintiff with hand paresthesia, and requested MRIs be taken of the left shoulder and elbow. (*Id.* at 101; *id.* at 26-29)

Reviewing the MRIs taken in March and April 2012, Dr. Elliot Wagner found Plaintiff had a partial tear of the supraspinatus tendon. (Doc. 9-8 at 28-29) He determined Plaintiff had "[m]ild changes of osteoarthritis in [the] gleno-humeral joint;" [m]ild lateral down sloping of acromion;" [d]egenerative changes in the acromio-clavicular joint, with hypertrophic spurs impinging the musculotendinous of supraspinatous;" and "[m]inimal synovial effusion." (*Id.* at 29) In Plaintiff's elbow, Dr. Wagner found "[m]ild changes of osteoarthritis … in the form of osteophytes and reduction of joint space." (*Id.* at 26) Further, Plaintiff had "tendinosis of the insertion of the triceps tendon," and "[m]ild subcutaneous edema… around the elbow joint." (*Id.*) At a follow-up appointment with Dr. Lewis regarding the results of the MRIs, Plaintiff's physical examination was "essentially unchanged." (*Id.* at 78)

On June 1, 2012, Plaintiff had x-rays taken of his left shoulder. (Doc. 9-8 at 25; Doc. 9-9 at 31) Dr. Elliot Wagner found the joints had a "normal alignment," and the bones had "normal density." (*Id.*) Dr. Wagner concluded there were no abnormalities shown in the image. (*Id.*)

Dr. William Previte conducted an orthopaedic evaluation related on June 23, 2012. (Doc. 9-8 at 30) Dr. Previte noted that Plaintiff described "neck pain radiating to the left upper extremity," which

consisted "of a tingling sensation as well as numbness, but there [could] be sharp pain." (*Id.* at 36) Plaintiff said the intensity of his symptoms was "4 on a scale of 10." (*Id.*)  He told Dr. Previte that the pain in his left shoulder occurred "with pushing, pulling, lifting and in particular overhead activity." (*Id.*)  Plaintiff said he was independent with "bathing, feeding, dressing, and undressing," and he could cook, wash dishes, and do laundry; but his symptoms increased if the actions became repetitive. (*Id.*) Dr. Previte determined found had "full active and full passive range of motion" in his left shoulder, though his coracoacromial arch was tender to palpation. (*Id.* at 39) Dr. Previte said it appeared Plaintiff had "rotator cuff syndrome of symptomatic nature and the possibility of a left upper extremity radiculitis or radiculopathy." (*Id.* at 40) Dr. Previte concluded Plaintiff should be "preclude[d] . . . from extremes of motion or repetitive neck movements, as well as forceful use of the left upper extremity below, or at above shoulder level. He is additionally precluded from repetitive overhead work with the left arm." (*Id.* at 41)

Dr. S. Clancey reviewed the medical record on August 6, 2012, and completed a physical residual functional capacity assessment. (Doc. 9-4 at 7-9) Dr. Clancey opined Plaintiff could lift and carry up to twenty pounds occasionally and ten pounds frequently. (*Id.* at 8) Dr. Clancey concluded Plaintiff was limited with his ability to push and pull in the left upper extremity, and was precluded from constant overhead reaching, though occasional overhead reaching was "OK." (*Id.*)  Further, Plaintiff was limited to frequent climbing ramps or stairs, stooping, kneeling, crouching, and crawling; and occasional climbing ladders, ropes, and scaffolds. (*Id.*)  According to Dr. Clancey, Plaintiff could not do constant or frequent "quick head turning/prolonged upward gaze." (*Id.* at 9)

On September 5, 2012, Dr. Lewis performed a "[p]artial anterolateral acromioplasty of left shoulder with resection of coracoacromial ligament." (Doc. 9-9 at 38) Dr. Lewis noted the surgery included "[e]xtensive debridement of subacromial bursa and rotator cuff, left shoulder;" "[a]rthroscopy with resection of distal end of left clavicle;" and "[i]ntraarticular injection." (*Id.*)  He opined that Plaintiff "tolerated the procedure well." (*Id.* at 39)

In November 2012, Plaintiff reported his pain in the left shoulder was "6 out of 10." (Doc. 9-8 at 50, 52) He said his shoulder had "improved vastly" with physical therapy. (*Id.* at 52-53) Dr. Lewis found Plaintiff's "flexion on the left is 140º/180º, extension is 50º/50º, abduction is 125º/180º,

6

adduction is 50º/50º, internal rotation is 90º/90º, [and] external rotation is 70º/90 º." (*Id.* at 53)  He noted that Plaintiff's range of motion was "within range for his wrist, and "the only thing that [was] causing him pain with those motions [was] his shoulder," though there was "vast improvement." (*Id.*) Dr. Lewis recommended Plaintiff continue with physical therapy and prescribed medication for pain, inflammation, spasms, and paresthesia.  (*Id.* at 54)

Plaintiff described his pain as a "5 out of 10" in his "shoulders, arms, wrists, hands [and] fingers" in December 2012.  (Doc. 9-8 at 48; Doc 9-10 at 87)  He did not report any discomfort with his chest or lower extremities.  (Doc. 9-10 at 81)  Dr. Lewis determined that Plaintiff's inflexion increased to 145º out of 180º, but his abduction was 40º out of 180º.  (*Id.*)  He indicated that Plaintiff was able to work "with the following restrictions:  No excessive [use] of the left hand and arm.  No lifting above shoulder level or working with arms above shoulder level." (*Id.* at 82)  Further, Dr. Lewis opined that Plaintiff should be precluded from "extreme motion or repetitive neck movements." (*Id.*)

In January 2013, Plaintiff described his pain as a "4 out of 10 in his lumbar spine and … 5 out of 10" in his left shoulder.  (Doc. 9-10 at 64)  Dr. Lewis found Plaintiff's range of motion in his left should had increased and his flexion range was 160º/180º and abduction was 150º/180º.  (*Id.*) Plaintiff's range in his lumbar spine was limited to flexion 60º/90º and extension was 10º/25º.  (*Id.*)  Dr. Lewis observed that while Plaintiff's pain was "unresolved, his physical exam [was] actually improving per the goniometer readings." (*Id.* at 65)  Dr. Lewis again opined Plaintiff could "work with the following restrictions: no excessive use of the left hand or arm, no lifting above shoulder level or working with arms above shoulder level, [and] no extreme motion or repetitive neck movements." (*Id.* at 66)

Dr. Alan Coleman reviewed the record on January 22, 2013, and noted Plaintiff had a "generally unremarkable" examination with Dr. Previte, with good range of motion and no tenderness. (Doc. 9-4 at 42)  He affirmed the findings of Dr. Clancey, concluding Plaintiff could perform light work with "exertional, postural and manipulative limitations." (*Id.*)

Plaintiff reported increasing pain in his spine in April and May 2013, with the pain in his cervical spine a "5/10" and the lumbar spine "6/10." (Doc. 9-10 at 53-54)  In addition, Plaintiff said the pain in his left shoulder was "much worse…than it was before the surgery," and there was "numbness

7

and tingling that radiate[d] down into the arm." (*Id.* at 54)  Plaintiff told Dr. Lewis the sometimes there was "a sharp quality… as if he [was] being stabbed in his shoulder," and the "numbness [was] so severe that he actually awakens due to it" if he rolled over on it at night. (*Id.* at 44, 54)  Dr. Lewis noted that he "[n]ormally… would be titrating his pain medication doses down," but because Plaintiff reported his pain was increasing, Dr. Lewis refilled the medication. (*Id.* at 56)  Dr. Lewis again concluded Plaintiff was able to work restrictions for use of his shoulder. (*Id.*)

On July 11, 2013, Plaintiff had an MRI of his cervical spine. (Doc. 9-10 at 37)  Dr. Maurice Davidson determined Plaintiff had "slight degenerative change with spondylosis involving [the] C5 and C6 vertebral bodies." (*Id.*)  Also, Dr. Davidson found Plaintiff had "mild posterior bulging of the discs which impresses upon the thecal sac" at the C4/5 and C5/6 levels." (*Id.*)

In August 2013, Plaintiff continued with "complaints of pain in the cervical spine at 6/10 to 7/10, on the subjective pain scale, constant and achy; lumbar spine [was] 5/10, constant and achy; and left shoulder pain [was] 6/10, achy with numbness that radiate[d] from the shoulder and into the cervical spine." (Doc. 9-10 at 22)  He received an epidural spinal injection, but reported it "caused a severe migraine headache and did not help with his pain at all." (*Id.*)  Upon examination, Dr. Lewis determined Plaintiff had a "fairly full range of motion of the cervical spine, lumbar spine and shoulder." (*Id.*)  Similarly, Dr. Rasheed Amirah examined Plaintiff and found he had "[f]ull flexion, extension, and lateral bending." (Doc. 9-9 at 64)  Dr. Amirah advised Plaintiff "to conduct all activities of daily living as normally as possible, walk for exercise as tolerated, begin [a] home exercise program, [and] continue health diet." (*Id.*)

In October 2013, Plaintiff sought treatment from Dr. Lewis, explaining he "was worried that he might have re-injured his shoulder his left shoulder." (Doc. 9-10 at 14)  Plaintiff reported that "[h]e was on a bunkbed in jail, jumped down from the upper bunk holding onto the bunk with his left arm and had some pain." (*Id.*)  He described his pain as "8/10" in the cervical spine and "7/10" in the lumbar spine. (*Id.* at 15)  Dr. Lewis determined Plaintiff had a "full range of motion of the left shoulder," and "no loss of musculature or sensation." (*Id.*)  Dr. Lewis concluded Plaintiff could work that did not require "excessive use of the left arm … lifting above shoulder level or working with arms above shoulder level." (*Id.* at 9)  Further, Dr. Lewis opined Plaintiff was precluded from "extreme

motion or repetitive neck motion." (*Id.*)

**B.     Administrative Hearing Testimony**

Plaintiff testified at a hearing before the ALJ on January 31, 2014. (Doc. 9-3 at 27) He said that he had an eleventh grade education, which included forestry vocational training in high school. (*Id.* at 29) Plaintiff reported his work history included ironwork, metal fabrication, and press/welding line operations. (*Id.* at 30, 38)

He stated he had "a constant ache" in his left shoulder, which went "numb and tingle[d]… along with [his] neck" following the electrocution injury. (Doc. 9-3 at 30) Plaintiff said he also had trouble with his upper back, left hand, and left arm. (*Id.* at 30-31) He explained his "whole arm" also went numb and tingled. (*Id.* at 31) Plaintiff said he did not "have a problem holding something in [his] hand," but his strength was not good for overhead reaching or lifting something above his head. (*Id.* at 31-32)

Plaintiff testified that he was taking Tramado, Naprosyn, Naproxen, and Gabapentin for his pain. (Doc. 9-3 at 33) He said they "relieved some of the…ache, [and] the constant pain." (*Id.*) He reported he did not have side effects such as nausea or tiredness, but believed Gabapentin caused him to "wake up periodically in the middle of the night with nightmares." (*Id.*)

He testified that prior to his incarceration he spent his days at home reading books. (Doc. 9-3 at 33) Plaintiff stated he did not do household chores "[b]ecause it would cause pain." (*Id.* at 34) He said he was able to take care of personal needs, such as dressing and bathing, and did so with his right hand. (*Id.*) Plaintiff said he was unable to lift anything with his left hand or arm, and that when he attended physical therapy, he lifted only "one-pound-to-two-pound little weight[s]." (*Id.* at 35) He estimated that with his right arm, he could lift a 40-pound dumbbell. (*Id.*) Further, he believed he could stand about twenty to thirty minutes before he needed to sit, but had no problems with walking or sitting. (*Id.*)

Vocational expert Robin Scher testified after Plaintiff at the hearing. (Doc. 9-3 at 36) She identified Plaintiff's past work—using the *Dictionary of Occupational Titles*[1]—as an assembly press

---

[1] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v.*

operator, DOT 690.685-014; truck driver helper, DOT 950.687-010; and construction worker, DOT 869.664-014. (*Id.* at 39-40)

The ALJ asked the VE to consider an individual of the same "age, education, and work experience" as Plaintiff, who could "perform light physical exertion." (Doc. 9-3 at 40) The individual could "never work overhead with the left non-dominant arm and he must avoid extremes of motion or repetitive motion of the neck." (*Id.*) The ALJ explained that "extremes of motion" meant he could not "crank his neck all the way to the left or all the way to the right … [or] move his neck repetitively." (*Id.*) The VE opined a person with these limitations could not perform Plaintiff's past relevant work, which exceeded the physical exertion level. (*Id.*) However, the VE believed such a person could perform other work in the national economy, including: cashier, DOT 211.462-010; laundry worker, DOT 302-685-010; and cleaner, housekeeping, DOT 323-687-014. (*Id.* at 40-42) The addition of a restriction to "occasional use of the left hand for fingering, gripping, [and] grasping" did not have any effect upon these positions. (*Id.* at 44)

Next, the ALJ asked the VE to consider an individual who "again can lift and carry 20 pounds occasionally, ten pound frequently" (Doc. 9-3 at 42) The ALJ stated the person was limited to standing and walking "only three to four hours in an eight-hour day and [could] sit six hours." (*Id.*) Further, the ALJ said the hypothetical individual had "no practical use of the left non-dominate arm at all," coupled with "the same restriction on his neck." (*Id.*) The VE opined that the cashier job would still be available, "but there would be an erosion of…50 percent [of the available jobs] to accommodate that." (*Id.*) In addition, the VE opined the person could perform other "one-arm jobs" such as photocopying machine operator, DOT 207-685-014, and ticket seller, DOT 211.467-030. (*Id.* at 43-44)

**C.   The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of September 25, 2006. (Doc. 9-3 at 14) At step two, the ALJ found Plaintiff's severe impairments included: "degenerative disc disease, left shoulder degenerative joint disease with partial tear of supraspinatus tendon, and post left-shoulder arthroscopy."

---

*Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

(*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a listing, including "listing 1.04 for degenerative disc disease, listing 1.02 for left-shoulder degenerative joint disease, and listing 1.03 for status post left-should arthroscopy." (*Id.* at 15) Next, the ALJ determined:

> [Plaintiff] has the residual functional capacity to lift and carry 20 pounds occasionally, and 10 pounds frequently; and stand and walk, or sit, 6 hours in an 8-hour workday. He must also avoid extremes of motion, or repetitive motion of the neck, and can perform no overhead work with [his] left arm.

(*Id.*) Based upon this RFC, the ALJ determined Plaintiff could not perform any past relevant work, but his "age, education, work experience, and residual functional capacity allow him to perform jobs that exist in significant numbers in the national economy." (*Id.* at 18) Consequently, the ALJ found Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 19-20)

## DISCUSSION AND ANALYSIS

Appealing the decision of the ALJ, Plaintiff asserts the ALJ failed to identify legally sufficient reasons for finding Plaintiff's testimony regarding his subjective complaints. (Doc. 12 at 4-9) On the other hand, Defendant argues the ALJ properly evaluated Plaintiff's credibility and the decision should be affirmed by the Court. (Doc. 13 at 2-6)

In assessing credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Where the objective medical evidence shows an underlying impairment, and there is no affirmative evidence of a claimant's malingering, an "adverse credibility finding must be based on clear and convincing reasons." *Id.* at 1036; *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).

The ALJ determined Plaintiff's "medically-determinable impairments can reasonably be expected to cause his alleged symptoms." (Doc. 9-3 at 17) However, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ." (*Id.*) Consequently, the ALJ was required to set forth clear and convincing reasons for rejecting Plaintiff's testimony regarding his limitations.

Factors that may be considered by an ALJ in assessing a claimant's credibility include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct, (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment, and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002) (the ALJ may consider, inconsistencies between a claimant's testimony and conduct, a claimant's reputation for truthfulness, and a claimant's daily activities when weighing the claimant's credibility). The ALJ considered a number of factors including Plaintiff's level of activity, conflicts with the medical record, and his refusal of treatment. (*See* Doc. 9-3 at 17-18)

1. Plaintiff's level of activity

A claimant's ability to cook, clean, do laundry and manage finances may be sufficient to support an adverse finding of credibility. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (the claimant's activities "suggest she is quite functional. She is able to care for her own personal needs, cook, clean and shop. She interacts with her nephew and boyfriend. She is able to manage her own finances..."). Likewise, an ALJ may conclude "the severity of . . . limitations were exaggerated" when a claimant exercises, and participates in community activities. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009).

Here, the ALJ noted that Plaintiff testified "he can perform his normal activities of daily living." (Doc. 9-3 at 18) In addition, the ALJ noted Plaintiff said he could do errands without assistance, and "bathe, feed, dress and undress with full independence." (*Id.*) Because Plaintiff retained the ability to perform his activities of daily living—despite the allegations of only being able to use one arm— his level of activity supports the determination that his impairments were not as disabling as Plaintiff alleged. *See Stubbs-Danielson,* 539 F.3d at 1175; *Burch*, 400 F.3d at 681; *see also See Molina v. Astrue,* 674 F.3d 1104, 1113 (9th Cir. 2012) ("Even where … activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment").

12

2.      Objective Medical Record

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis"). Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

However, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to simply state that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ must identify "what evidence suggests the complaints are not credible").

In this case, the ALJ noted that despite complaints of "neck pain radiating to the left upper extremity," Plaintiff's examinations were "generally normal… including normal ranges of motion." (Doc. 9-3 at 17, citing Doc. 9-8 at 9, 25; Doc. 9-10 at 14)  For example, the ALJ observed, "The most recent MRI of the cervical spine shows only slight degenerative changes," and "there was no edema, erythema or bony deformity." (*Id.*, citing *e.g.* Doc. 9-9 at 53)  Further, the ALJ observed that Dr. Previte found Plaintiff had "full active and passive range of motion in the left shoulder and nothing significant involving the mid and low back." (*Id.* at 17-18)  The ALJ gave "great weight" to the opinions of Dr. Previte and Plaintiff's treating physician, Dr. Lewis, who opined Plaintiff was able to work with restrictions in place for his left arm, lifting, and neck motions. (*Id.* at 17)

13

1    Because the ALJ identified inconsistencies between the medical record and Plaintiff's
2 testimony, the objective medical record supports the adverse credibility determination. *See Greger*,
3 464 F.3d at 972; *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (an ALJ may consider
4 "contradictions between claimant's testimony and the relevant medical evidence").

5    3.    Treatment

6    When assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness,
7 and side effects of any medication." 20 C.F.R. §§ 404.1529(c), 416.929(c). Importantly, when an
8 impairment "can be controlled effectively with medication," it cannot be considered disabling. *Warre v.*
9 *Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).

10   Here, the ALJ observed that Plaintiff reported "pain medication and injections did not relieve
11 his pain, which is contrary to the medical evidence of record….indicat[ing] his pain was well-
12 controlled with medications on multiple occasions." (Doc. 9-3 at 18) Further, the ALJ noted that
13 Plaintiff "refused a referral to neurosurgery," which the ALJ found indicated Plaintiff's "pain was not
14 as intense as described." (*Id.*; *see also* Doc. 9-8 at 14) As the Ninth Circuit explained, "if a claimant
15 complains about disabling pain but fails to seek treatment… for the pain, an ALJ may use such failure
16 as a basis for finding the complaint unjustified or exaggerated." *Orn v. Astrue*, 495 F.3d 625, 638 (9th
17 Cir. 2007) (citation omitted). Accordingly, this factor supports the adverse credibility determination.

## **CONCLUSION AND ORDER**

19   For the reasons set forth above, the ALJ properly set forth findings "sufficiently specific to
20 allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds."
21 *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958. Because the
22 ALJ applied the proper legal standards, the determination that Plaintiff is not disabled must be upheld
23 by the Court. *Sanchez*, 812 F.2d at 510.

24   Accordingly, **IT IS HEREBY ORDERED**:

25   1.    The decision of the Commissioner of Social Security is **AFFIRMED**;
26 ///
27 ///
28 ///

2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security, and against Plaintiff Alan White.

IT IS SO ORDERED.

Dated: **January 26, 2017**             /s/ Jennifer L. Thurston
                                           UNITED STATES MAGISTRATE JUDGE